Good morning, Matt Larson of the Federal Defender's Office for Mr. Beard. Your Honors, Mr. Beard's brother, William, had no authority to let police into Mr. Beard's home to conduct a search. But for that unlawful search, Your Honors, I'm going to interrupt you because I want to get to the part of the case that I think, for me, is troublesome about your position. Speaking only for myself, I think it's a search. I don't see any authority for the brother to let them in. But getting all the way to the end game, it seems to me that discovery was inevitable. I see no reason in this record to think that the exact same thing wouldn't have happened, have the police stayed on the front porch and talked to the brother outside the home. The brother really wanted to distance himself from this material and really wanted to give it away. So could you address why inevitable discovery wouldn't yield an affirmance despite all your other arguments? Absolutely. What the record shows is that William Beard not only wanted to distance himself from certain materials, but wanted to distance himself from the police. He did not volunteer the critical information here. He himself, as the government disclosed in district court, had been investigated for child pornography. But did the brother call the police? The wife called the police. So the police didn't show up there on their own. So here's what the record does show, because as we know from Nix v. Williams and looking at inevitable discovery, we're limited to the record, and we can't speculate. We have to look at what the facts showed. And the facts showed here that it was Beatrice who called the police. She found the material that she thought might be contraband, which didn't turn out to be contraband. She called the police. They came to the house. And there's a factual finding that he answered the door, the brother answered the door, and spoke with the officers. And he testified that he wanted them to take the DVDs off his hands, and he answered the questions about the hard drive and so forth. So I guess I don't understand why that conversation wouldn't have been identical had it been completed on the porch. The conversation which led to the hard drive at issue happened in the home. I know that. The reason that that would have been the reason, Your Honor, that the government can't prove it would have been inevitable is that on the facts here, if the police had gotten to the house, encountered the brother, and not entered, as they should not have, the next logical step would be to speak to the woman who had called them. No. The next logical step would be to continue to talk to the brother on the porch. Well, here's what the record also shows, Your Honor. The conversation that led to the hard drive did not happen at the outset. It happened after the agents entered the home, were led down the hallway. Literally, that's true, but it doesn't really go to my question, because, of course, it happened in the house. That's why we're having this conversation. But I don't understand why the identical conversation wouldn't have happened elsewhere, because, you know, everything and the hard drive wasn't in the house anyway. Correct. And here's what triggered that conversation, Your Honor. It was the agents looking through the materials and taking some which they thought might be contraband. Remember, they were called to the house because Beatrice said, I see some tapes. They might be contraband. I'm not sure. The agents came in and they testified. And all they had to say was, could you bring the assuming that they knew they weren't supposed to go in the house. Would you bring those on out and let us take a look at those? I think even what we know about the brother's state of mind, I really don't understand how it would have come out any differently. The brother's state of mind was that he displayed no interest in talking to the police. When he led them back to the bedroom, he left them alone to conduct the search. He didn't volunteer the information here. He didn't want to talk to them. It was only after they went through the various materials in the bedroom and picked and chose certain things that they thought might be contraband, which were CDs and tapes. They then said, oh, in the conversation in the living room when they're questioning the brother, they go through whatever they went through, and one of their questions was, well, now that we found these media which might be contraband, is there something else like a computer? Now, if they had remained outside and spoken to Beatrice, it's undisputed that she knew nothing about the hard drive. Therefore, she couldn't have been a route to discover the hard drive. Counsel, if I could ask you a question that relates to that argument. The brother lets them and answers the door and lets them in the house. Why doesn't he have apparent authority to do that, which raises some other issues? He doesn't have apparent authority, Your Honor, because for apparent authority, the officers need to have reasonably believed that the brother had actual authority to consent to the search. And we know here that's impossible because the record shows that the brother told them he didn't live there and he told them he was there only to clean the house out. In other words, he was there for a limited purpose. And this Court held in Kim that people with a limited right of access to a particular property lack actual authority to consent to a search. But, okay. See, my problem is with your case, but, I mean, I'm not even at the inevitable discovery, and then Judge Gould is at the apparent authority, and then going back to the actual authority, that, I mean, the police didn't just show up there. They were called there. That's right. And they were also shown a document, correct? They were not shown a document. They didn't even ask for the power of attorney. He said he had one, but they didn't ask for it and they didn't look at it. What happened was Your client's in jail. That's right. Been arrested. And the brother is cleaning out because he says he has the power of attorney, right? That's right. And your client's going to get evicted. In a month, yes. So, and he's not going to get out of jail. And so his, and it's not a place that he owns even. It's a place that he's renting, right? Oh, if Your Honor is alluding to whether he had an expectation of privacy, this court said in Young and other authorities that someone who was arrested does not lose their expectation of privacy in their home. He had a lease. He was paying rent. The lease had not been terminated. He hadn't been evicted. He still had an expectation of privacy in his home, even though he wasn't physically there. When the, what was, what this case is like is the case in Young. A hotel staff goes into someone's room. They find contraband, or what they think is contraband. They call the police. The police come to the residence. They enter without a warrant. This Court held that's unconstitutional. They need a warrant to get in, or they need effective consent. Going back to Judge Graber's point about inevitable discovery, the cases that find inevitable discovery are record grounded. In Nix, which established this doctrine, the Court said in finding, in Nix, basically, the police were looking for a body. They had search teams out in the woods. And the defendant was interrogated in violation of his right to counsel and disclosed the location of the body. The police then went and found the body. The Supreme Court said the police inevitably would have found the body anyway because there was record testimony from the investigating officers that a search was being conducted in the relevant area and that it was only a matter of time, in that case, I believe it was four to six hours, before they would have gotten to the spot where the body existed. Here, we simply don't have that. Here, it was chance, Your Honors. It was a matter of fortuity that they interrogated William in the home and discovered in the course of this that he had taken a hard line. Yes, but everything they did up to the point of walking through the door was legally permissible. So their initial contact with the brother was lawful, and their initial discussion and their desire to find out whether there was, in fact, contraband among the personal effects as to which the brother had actual authority. So there is a record support, it seems to me, for the fact that the police weren't just going to shrug their shoulders and walk away. Not shrug their shoulders, Your Honor, but strikingly absent from the record, which is present in the record in other cases where inevitable discovery is found, is testimony. Agent McKinnon did not testify that it is routine procedure for the VA Office of Inspector General to question a stranger, because, again, they didn't know William, who is present at the house, going in and out, and doesn't voluntarily speak to them. It doesn't have to be routine. If it happened here, then that's what we need to know. The problem with the government's argument about inevitable discovery is that it assumes what would happen. It assumes that if they had stayed outside, they would have initially and immediately asked William about a computer, but that's not what the record shows. They asked him about a computer only after entering the home, searching it, indeed finding what they thought was contraband. If they had found none, they wouldn't have proceeded with an interrogation. It was only after they found the items that they then interrogate him in the living room and ask the question which leads to the hard drive. He did not volunteer the information. The hard drive wasn't in the home. It was not inevitable that they would have found it there. It's only the government's speculation or assertion that, oh, if things had happened differently, this is how it would have played out. But what the record facts show is that the cops didn't even know who William was. They didn't even know he was there. He was a total stranger. All they were expecting to find was Beatrice. Okay. Well, I know you don't agree with Judge Graber on that point. Now, on the apparent authority, is not that judged from a reasonable officer's perspective, not from a contract's, not a power of attorney contract's professor? Right. A reasonable person has to face a person that's correct. A reasonable officer. Is it not a reasonable officer? And the objective facts, from my perspective, indicate that the agents could reasonably rely on William's conduct and the power of attorney to admit him to the house for the purpose of retrieving certain contraband. And I'm looking at Sledge, where Justice Kennedy, I think, wrote that the officer in the case before us acted with care to determine that the landlord's authority to admit him. He reviewed the landlord's recitation of the facts, which indicated abandonment. The facts were consistent with the owner's observations and knowledge of the case. He was entitled to assume that appellant's expectation of privacy had not survived the landlord's apparent right to enter the property and to consent to the search by law enforcement. So why why in this case the officers are called out there, they know the guy's in custody, right? Yes. And that the guy says he has a power of attorney, he says all of this. Why couldn't the officers reasonably rely on that, that he had authority? Because the man they encountered, who was a stranger to them, says, I don't live here, and he claimed to have the power of authority, which they didn't even ask to look at, but he said, the reason I have it. Wouldn't it be a different case if they had gone to the door, but they're called out there? Yes. So doesn't that make it a little more likely that the person is who they say they are? Your Honor, if a chambermaid in a hotel calls the police saying, I find, I see contraband in the room, she calls the police to the door, she doesn't have the authority to admit them to search. That's very clear. Someone who has a limited right of access to someone else's residence cannot consent to a police search. That's what happened here, Your Honor. Someone who told them, I don't live here, and I'm here just to clean it out. And I have the power of attorney. Did he say he had the power of attorney? He said he had a power of attorney in order to clean the house out. He's moving the stuff out because the person's being evicted a month later. Now, under those facts, no reasonable officer would think someone who is essentially a moving person can consent to a police search. That's what happened here. Well, the moving person's his brother and the ex-wife called, so I think your statement of the facts is certainly supports your position as a good advocate, but I don't think this was a moving company. No, it's the brother, but it's the brother who had never set foot in the home before he had been asked to do this.  And he told the police that. That's, I think, the critical point about apparent authority. He told them, I don't live here and I'm here only to clean the place out. No reasonable person would think that he could then consent to the police coming to the home looking for contraband. Okay. We'll give you a little bit of rebuttal time at the end because we've used a lot of it with questions. Good morning, Your Honors. Anthony Brown for the United States. Judge Callahan, let me start with your questions about apparent authority here because I do want to add some facts to the mix here that have not come out during the course of the discussion. I'm also interested in actual authority, too. I can probably address both of those at the same time. The first thing is that when the agents showed up that day, they knew far more than the defendant has suggested. The agent who conducted or actually showed up that day testified that she had been informed that both William and Beatrice were there. That's on the record. They were there, but neither one of them lived there. That's correct. If that's an ex-wife, when's a brother? They know that, right? They know about the ex-wife being ex. They know about the ex-wife. And they also know that the ex-wife contacted a VA agent in Chicago who then relayed that message back to the VA in Los Angeles. So they knew that the wife had some connection with the VA already. In fact, the connection that she had was that she was aware that her husband had been investigated in Chicago on an unrelated matter. So they had been informed. But she did not live in the house. She did not live in the house. And neither did the brother. No, that's correct, Your Honor. Okay. And the brother's power of attorney was over personal property and expressly excluded real property, correct? It excluded real property transactions, and it included the real ---- it came in the form of a list. Well, what did the officer know? So the officer knew that William Beard was there, that Beatrice Beard was there. The officer knew that William Beard ---- that Raleigh Beard, the defendant, had had a position at the VA, but there was some investigation into him. He no longer resided at the premises, that he was being evicted by the VA because they wanted the property back. But had not been evicted. They knew that he had not yet been evicted. That's correct. Okay. But that's still his house. It was still his house. I'm not disputing that. The difference here is that they had been called specifically to come and retrieve child pornography because it had been described in William's own words as he testified during the hearing. Is it the government's position that if there is personal property that constitutes contraband within someone's home, and they're told about it, they have the right to enter and search for it? So if I'm a visitor at my neighbor's house for dinner, and I see, you know, cocaine lying on the table, and I call the police, do they have a right to enter without a warrant because they've been told there's contraband? No, Your Honor. They don't. Okay. You need a warrant. Well, then I don't understand what difference it makes that they were told by someone who didn't live in the house that there's contraband in the house for the purpose of searching the home. I have two answers. One is William had actual and apparent authority to allow them to enter the house. He had actual authority because he held on to a power of attorney that gave him the might want to come into the house. In fact, as testified to at the suppression hearing He didn't hire the police, and the police are But he also had power to contract and power to get the assistance of other people. As the defendant testified during the suppression hearing, he specifically intended William to go into the house and assumed he would let other people in and assumed he would need other people to come into the house to assist him. So it was the intention of the defendant to have his brother and others go into the house. That was the defendant's testimony in this case. Would you be kind enough to discuss your view of the inevitable discovery issue? Of course, Your Honor. I think the defense position rests on two assumptions that are unwarranted here. First, the defendant assumes that when the agents showed up to the house, they would only have looked for Beatrice Beard. But as the record shows, especially on ER-421, Agent McKinnon was aware that Raleigh Beard was there. The court also found that when she showed up, William Beard answered the door and that he was accepting them. There was a factual finding to that offense. There was a factual finding, which is entitled to deference. William Beard answered the door. They had been called there with the express purpose of coming to pick up what had been reported as possible child pornography. There is no doubt that if the agents had not crossed the threshold, let's put Agent McKinnon in this situation. If she had said, Mr. Beard, I'm sorry, I have concerns about whether I need a warrant to enter the house, I'm not going to enter the house. There is no doubt, no doubt whatsoever that William Beard would have brought the material out. And that's because he had specifically called through Beatrice to have the material taken from him. He testified that he didn't want to have anything to do with it. He had a separate reason. And he had a defense for that, which he also testified to. He had secret clearance and he was concerned that that might come back and bite him. I think that was his testimony. In addition to that, this is not a case like Nix. This is a better case than Nix. In Nix there was an ongoing investigation that required some inference for the Court to believe that the investigators ultimately would have found the body. They found the body. The private party searched and found the suspected child pornography in this case. And they called the police to come and get it. So there's no assumption, there's no speculation about that at all. The second thing is that, I think the second step of this is whether Agent McKinnon would have inquired about the computer. And there's no doubt that William would have brought the material out to her. We know that she did inquire about the computer after having viewed it. So there can be little doubt that if William had brought it out to her, she would have inquired about the computer. She also testified that as soon as she heard that child pornography might be involved in this case, she started to think about whether a computer would be in the residence. So there can be little doubt, and it's not speculation, about whether she would have asked about the computer. And if I can get back to apparent authority, just to fill in some of the facts, it wasn't only the fact that William was in the property, Your Honor, but the agents noticed that there was no sign that anyone had broken into the property. Judge Callahan, William Beard said that he had a power of attorney, but he didn't actually have it on him that day, that he would be willing to provide it to the agents. And in fact, he did fax it to them the following day. The agent knew that Raleigh Beard needed to move out of the apartment, and that he had people over there who were trying to pack up his belongings and move them out. They saw the people moving in and out of the apartment. When they showed up, Agent McKinnon testified that William Beard acted as if he expected them to come. Under those circumstances, and especially considering the fact that they had been specifically called out there to retrieve property that had been identified as possible contraband, any reasonable officer would have believed that it was okay to go into the property for the specific reason that they were called there, which is to go get what was possible contraband. What about actual authority? There are two ways to analyze this, and one is under the power of attorney. And I think that the power of attorney granted William broad rights over the property. Those rights included the right not only to conduct tangible personal property transactions, but also to contract people to come and help him out. And yes, he did not contract law enforcement to come in. But the idea of a contract is to get somebody else's help and agree that they can help. I think that that's the power of attorney. I really, I mean, I can only speak for myself, but I think it's kind of an unusual thing to say that if someone has authority, either actual or apparent, over items of personal property located within a home, that that equates to common authority over the premises, which is what is required to consent to a search of premises. And that's the thing that seems to elide in your argument that I have trouble with. Well, it's because, Your Honor, I think, and this will lead me to the second grounds for why there was common authority. The power of attorney was given to William with the express purpose of allowing him into the house so that he could get all the property. He was going to move. Correct. That, I think everyone agrees with that. What I have difficulty with is saying that common authority over personal property located within a home equals common authority over the home. That's where I don't think that logically follows. Even assuming that were the case, Your Honor, the power of attorney would be strong evidence of the, what the defendant testified to at the evidentiary hearing, that he understood that William was going to have access to the entire house, to all of his belongings in the house, that William was going to be able to look through the property to determine which items he would throw out and which items he would keep. And that William, as the defendant said, assumed, I'm sorry, that Raleigh Beer, the defendant, assumed that his brother William was going to have to have people come in and help him out. Now, he did say he didn't think that he would invite his ex-wife into the house or that he would invite the police in. But the assumption was that he was going to have to have people come in. In fact, the defendant had had other people come into the house beforehand to help feed his cats. So while the power of attorney, let's suppose on technically as a matter of just a plain reading of the power of attorney, that doesn't also imply that William had the right to let people into the house to retrieve property that he had the right to dispose of. It certainly is strong evidence of the defendant's understanding and objective evidence of the fact that William had common authority over the property. Thank you, counsel. We'll restore a minute for rebuttal. Thank you, Your Honors. Ramirez-Sandoval, the case cited in my briefs, this Court said, Officer Torres's declaration contains no suggestion that he intended to question the occupants of the van who led to the incriminating evidence, and no evidence of that effect to that effect was introduced at the hearing. The government and the district court merely assumed that Torres would have questioned them in such a way as to elicit the relevant information. This is that case, Your Honors. This is the same thing. The government's argument is an assumption that if the cops had stayed outside as they should have, they would not have asked to talk to Beatrice. Instead, they would have focused on the stranger they encountered at the threshold and questioned him in such a way as to elicit the incriminating information. Your Honors, that's an assumption. Nix made clear, the Supreme Court case on inevitable discovery, that speculation is not allowed for inevitable discovery. There have to be demonstrated record facts. The record facts here are that the police did not know who William was. He was a stranger to them. They were expecting Beatrice. They went to talk to Beatrice. Beatrice called them. Beatrice, however, knew nothing of the hard drive at issue. It's the hard drive at issue here that's what counts, not the tapes, not the CDs. Thank you, counsel. Thank you. Your time has expired. We appreciate the arguments of both counsels. They've been quite helpful, and the case is submitted.
judges: Graber, Gould, Callahan